UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 15-197** |
| **BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC ET AL** | **SECTION: "H"(4)** |

## ORDER AND REASONS

Before the Court are Defendant Don Moss's Motion to Sever (Doc. 316); Defendant Curtis Dantin's Motion to Sever (Doc. 319); Defendant Grand Isle Shipyards Inc.'s Motion to Sever (Doc. 312); and Defendant Christopher Srubar's Motion to Sever (Doc. 317). For the following reasons, the Motions are GRANTED IN PART.

## BACKGROUND

The charges in the Third Superseding Indictment ("Indictment") arise out of a welding accident and explosion that occurred on an offshore oil platform called West Delta Block 32 Platform E (the "Platform") on November 16, 2012. According to the Indictment, Black Elk Energy Offshore Operations,

1

LLC ("BEE") owned and operated the Platform, located eight nautical miles off the coast of Louisiana. At some point prior to November 2012, BEE ceased oil production on the Platform in order to initiate repairs and other construction projects. One project involved adding a divert valve to the Lease Automatic Custody Transfer ("LACT") unit.

BEE contracted with an engineering firm, represented on the Platform by Defendant Don Moss, to design plans for some of the construction projects. The construction was to be physically completed by crews from Defendant Grand Isle Shipyards, Inc. ("GIS"), supervised on the Platform by Defendant Curtis Dantin. BEE also contracted with Defendant Wood Group PSN, Inc. ("Wood Group") to supply manpower for the Platform. Wood Group's operators, including the Person-In-Charge ("PIC") Defendant Christopher Srubar, were to support the construction efforts through crane operations and the issuance of necessary permits.

The construction projects required hot work, including welding, grinding, and other activities that may produce a spark. BEE had written policies for performing hot work on an oil platform, which GIS and Wood Group were required to follow. Specifically, the policies provided that before conducting hot work, a hot work permit must be issued. Before a hot work permit could be issued, the location of the hot work must be inspected for potential flammable or combustible materials and a calibrated gas detector must be used to ensure that no explosive atmosphere was present. These policies also required that a firewatch be designated to monitor the hot work while it was being performed.

On the days leading up to the explosion, Srubar issued hot work permits for construction work on the Platform. The Indictment alleges that beginning on November 10, however, Srubar delegated this duty to another Wood Group operator. On Srubar's instruction, this inexperienced operator issued hot work permits on November 10 through 16 by copying the one that Srubar had created on November 9. Neither Srubar nor the operator conducted a pre-work inspection or designated a firewatch on these days.

During construction, it was discovered that the prefabricated piping needed to complete the upgrade of the LACT unit was missing. In order to save time, a BEE manager decided that the piping should be rebuilt instead. This required the construction crews to weld near the LACT unit. The Indictment alleges that Moss and Dantin knew that welding on the sump line piping would be required to complete the LACT system upgrade. However, no inspection was performed in the LACT area prior to the welding that occurred on November 16, the day of the explosion. On that date, the Wood Group operator copied the previous day's hot work permit, which did not mention the LACT area. No gas detector was used and no firewatch was designated. In addition, neither the piping nor the tanks in the LACT area were rendered inert prior to the start of construction in the area.

On November 16, Dantin was watching as the crew began to cut the sump line piping leading to the wet oil tank in the LACT area. After the sump line piping was cut, liquid spilled from the piping. Dantin and the crew decided that the liquid was water and continued cutting and welding in the area. Dantin left the area thereafter and returned to his office. At approximately 9:00 a.m., as the workers attempted to weld the cut piping, hydrocarbon vapors

escaped from the wet oil tank and were ignited. The ignition set off a series of explosions, spilling oil into the Gulf of Mexico, killing three workers, and injuring others.

Counts 1 through 3 of the Indictment charge GIS with involuntary manslaughter for the deaths caused by the explosion. Count 4 charges Srubar, Moss, Dantin, and GIS with violations of the Clean Water Act.

Each Defendant has filed a Motion to Sever the trial of the charges against him from the other defendants under various theories. This Court will address their arguments in turn.

## LAW AND ANALYSIS

Defendants Moss, Dantin, and Srubar (the "Individual Defendants") argue that trial of the charges against them should be severed from trial of the involuntary manslaughter charges against GIS because of prejudice and misjoinder. Each Defendant argues that his trial should be severed from each of the other defendants because of antagonistic defenses and confrontation clause concerns. This Court will consider each argument in turn.

*a. Prejudice under Federal Rule of Criminal Procedure 14(a)*

Defendants Moss, Dantin, and Srubar aver that a severance from GIS is warranted under Federal Rule of Criminal Procedure 14(a) based on the potential "spillover effect" of combining the manslaughter counts against GIS with the Clean Water Act violations against the Individual Defendants. They argue that joinder with GIS is improper because of the prejudicial evidence necessarily associated with the manslaughter charges against it. Rule 14 gives the district court discretion to grant a severance "[i]f the joinder of offenses or

4

defendants . . . appears to prejudice a defendant or the government." The Individual Defendants point out that evidence regarding the deaths caused by the explosion would be inadmissible in a trial regarding only their negligence in causing an oil spill. They argue that the evidence of the involuntary manslaughter charges will be too emotional for the jurors to ignore in deciding their guilt on a technical Clean Water Act violation.

Defendants have not, however, pointed out a risk so significant as to warrant a severance. "It is well settled that defendants are not entitled to severance merely because they might have a better chance of acquittal in separate trials."[1] Indeed, "the mere presence of a spillover effect does not ordinarily warrant severance."[2] Defendants must show a "specific and compelling prejudice" against which this court cannot afford protection.[3] Defendants rely heavily on the court's analysis in *United States v. McRae* in their argument for a Rule 14 severance.[4] *McRae* involved the shooting death of Henry Glover by defendant police officer David Warren and the subsequent burning of Glover's body by his police officer co-defendants, without Warren's involvement or knowledge.[5] The Fifth Circuit granted Warren a new trial under Rule 14, holding that the evidence of the burning of Glover's body and subsequent cover-up, which did not apply to Warren, were prejudicial to the trial of the charges against him.[6]

---

[1] Zafiro v. United States, 506 U.S. 534, 540 (1993).
[2] United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993).
[3] United States v. Harrelson, 754 F.2d 1153, 1177 (5th Cir. 1985).
[4] United States v. McRae, 702 F.3d 806 (5th Cir. 2012).
[5] *Id.*
[6] *Id.* at 826–27.

In support of its holding, the Fifth Circuit cited to *United States v. Erwin*, in which it reversed a conviction for perjury that was "only peripherally related to a drug and racketeering conspiracy" with which it was tried.[7] In *Erwin*, the Fifth Circuit found that very little of the "mountainous evidence" of kidnappings, beatings, and killings was usable against or applied directly to the defendant.[8] The *McRae* court also relied on *United States v. Cortinas*, in which the Fifth Circuit allowed the severance of two members of a conspiracy who left the conspiracy before many of the more violent and inflammatory incidents occurred.[9]

Here, the acts of the Individual Defendants that give rise to the Clean Water Act charges are not easily separable from the acts which give rise to the involuntary manslaughter charges. Indeed, Dantin admits that it is only because of the allegations against him that GIS is charged with involuntary manslaughter.[10] The deaths underlying the involuntary manslaughter charges occurred simultaneously with the oil spill underlying the Clean Water Act charges, both caused by the same explosion. That said, the facts of this case are easily distinguishable from the cases cited by the Individual Defendants. Here, unlike in *McRae* and *Cortinas*, the involuntary manslaughter charges do not arise out of the subsequent actions of a co-defendant with which the Individual Defendants had no involvement. In addition, the charges against the Individual Defendants are not merely peripherally related to the involuntary manslaughter charges as in *Erwin*.

---

[7] *Id.* at 823.
[8] United States v. Erwin, 793 F.2d 656, 666 (5th Cir. 1986).
[9] *McRae*, 702 F.3d at 823; *see* United States v. Cortinas, 142 F.3d 242 (5th Cir. 1998).
[10] Doc. 319-1, p.16.

These distinctions are evidenced by the substantial overlapping evidence in the charges against each Defendant.

> The common evidence includes background information to familiarize the jury with operations on the oil platform, information about the fire and explosion hazards presented by welding work and the standard of care for minimizing such hazards, the development of the lease automated custody transfer ("LACT") project and the anticipated welding work to be performed on the sump line piping, the series of events in the days and hours before the November 16, 2012, explosion, and the facts of the explosion itself to include how oil tanks were blown off of the platform and into the Gulf of Mexico.[11]

The facts common to all charges indicate that this is not a case where the evidence of the involuntary manslaughter charges will predominate that of the Clean Water Act charges. Indeed, the deaths caused by the explosion are simply the next step in the story and will hardly be surprising to the jury in light of the evidence presented to that point.

Accordingly, the benefits of judicial economy outweigh the risk of potential prejudice in this case. Any potential prejudice can be cured by jury instructions, which a jury is presumed to follow.[12] The Court declines to grant a severance on this ground.

### b. *Misjoinder under Rule 8(b)*

Next, Moss and Dantin argue that a severance is warranted by Rule 8(b). Rule 8(b) permits the joinder of two or more defendants in the same action if "they are alleged to have participated in the same act or transaction, or in the

---

[11] Doc. 328, p.7.
[12] *See Pofahl*, 990 F.2d at 1483.

same series of acts or transaction, constituting an offense or offenses."[13] Dantin argues that the charges in this indictment are misjoined because the manslaughter charges "have nothing to do with" negligently causing an oil spill. Moss argues that he is misjoined in this action because the allegations against him are different from the allegations against the other defendants.

"Whether or not separate offenses are part of a 'series of acts or transactions' under 8(b) depends in turn on the relatedness of the facts underlying each offense."[14] As discussed above, each of the counts are based on the same allegedly negligently performed welding work causing the explosion that resulted in an oil spill and multiple deaths. The allegations against each Defendant are based on the series of acts that resulted in the explosion. Accordingly, this matter is not misjoined pursuant to Rule 8(b).

### c. *Mutually Antagonistic Defenses*

Each Defendant next argues that his trial should be severed because of mutually antagonistic defenses.[15] A mutually antagonistic defense is found where defenses are "in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other."[16] Severance is only warranted if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[17] "To compel severance the

---

[13] Fed. R. Crim. Pro. 8(b).
[14] United States v. Gentile, 495 F.2d 626, 630 (5th Cir. 1974).
[15] In his Motion, Moss argues that his trial should be severed from each of the other Defendants. Srubar's Motion asked only for severance from Dantin and GIS but he moved for severance from Moss on the record at oral argument. GIS and Dantin each move for severance from Srubar and Moss.
[16] United States v. Romanello, 726 F.2d 173, 177 (5th Cir. 1984).
[17] *Zafiro*, 506 U.S. at 539.

defenses must be antagonistic to the point of being irreconcilable and mutually exclusive."[18]

Each of the defendants contends that his defense is to place the blame on one of the other defendants. Dantin's version of events, upon which GIS also relies, is this: Moss and Srubar told him that the entire platform was degassed, and he relied in good faith on the hot work permits issued by Srubar in performing hot work in the area of the LACT on the day of the accident. He contends that Moss and Srubar are culpable for issuing hot work orders without ensuring the area was safe.

Moss and Srubar will argue that Dantin is culpable for failing to tell either of them that hot work was going to be performed on the day of the explosion and for performing hot work without a proper hot work permit or pre-work inspection.

Moss also states that he will present evidence that Srubar was aware that hot work was being performed on the LACT, while Srubar denies this. Srubar also suggests that Moss was in charge of safety on the platform, while Moss denies this.

The Government argues that the statements identified by the Defendants are neither irreconcilable nor mutually exclusive of each other. The Government argues that the jury could believe one defendant's defense without necessarily finding another negligent. Specifically, it argues that more than one defendant may be found guilty of the Clean Water Act offenses and that one defendant's acquittal does not depend on another's conviction. It argues, for instance, that "[t]he jury could accept that Srubar believed he acted

---

[18] *Romanello*, 726 F.2d at 177.

reasonably and believed that Dantin acted negligently, without necessarily concluding that GIS and Dantin did in fact act negligently and must be found guilty."[19]

In theory, the Government is correct. The Government's arguments, however, ignore the specifics of the Defendants' defenses. The jury cannot believe both that Dantin told Moss and Srubar that he was engaging in hot work in the LACT area and that he did not. It cannot believe that Moss and Srubar told Dantin the entire platform was degassed and that they did not. It cannot believe that the hot work permit covered the LACT area and that it did not. "[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."[20] These irreconcilable arguments are not merely "minor or peripheral matters," but rather, are core to the Defendants' defenses.[21] This is the "prototypical example" of a case involving mutually antagonistic defenses "in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime."[22] While, in theory, the Government is correct that the jury could believe that all of the defendants acted reasonably given their subjective knowledge, Defendants' defenses make such an outcome unlikely. If the jury believes Dantin's version of the story, it will find that Moss and Srubar were negligent in failing to properly inspect the area upon which

---

[19] Doc. 328, p.13.
[20] United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir. 1981).
[21] *See id.*
[22] *See* United States v. Holcomb, 797 F.2d 1320, 1324 (5th Cir. 1986).

hot work was to be performed and in issuing a hot work permit without such inspection. If it believes Moss and Srubar's story, it will necessarily find that Dantin was negligent in failing to tell them that he was performing hot work in the LACT area on the day of the explosion. Accordingly, the defenses between Dantin, on the one hand, and Moss and Srubar, on the other, are mutually antagonistic and warrant severance.

The appropriateness of severance of the trials of Moss and Srubar, however, is less clear. While these defendants disagree on some of the facts—who was in charge of safety on the platform and who knew that hot work was going to be performed in the LACT area—these facts do not appear to be central to the defense of either Moss or Srubar. Instead, both men have evinced an intention to blame Dantin for the oil spill. The issues on which they disagree are merely "minor or peripheral matters," which do not warrant severance.[23]

### d. *Bruton and Confrontation Clause Issues*

Finally, several of the defendants raise arguments relating to *Bruton v. United States* and the confrontation clause.[24] The Court finds that these arguments are premature, as the Government has not indicated which, if any, of these statements it may use in its prosecution.

---

[23] *See Berkowitz*, 662 F.2d at 1134.
[24] *See* Bruton v. United States, 391 U.S. 123, 125 (1968).

11

## CONCLUSION

For the foregoing reasons, the Motions are GRANTED IN PART. The trial of Grand Isle Shipyards, Inc. and Curtis Dantin shall be SEVERED from the trial of Don Moss and Christopher Srubar on the basis of their mutually antagonistic defenses.

New Orleans, Louisiana this 31st day of January, 2018.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**